1. The instant case was originally filed under the caption, *Marvin J. Netsky, Marks Brother, Inc., and Eric Beane, On Behalf of Themselves and All Others Similarly Situated v. Capstead Mortgage Corporation, Ronn K. Lytle, Christopher T. Gilson, Julie A. Moore, Andrew F.*

Judgement shall be entered accordingly.

All relief not expressly granted is denied and all pending motions are hereby denied.

## In re CAPSTEAD MORTGAGE CORPORATION SECURITIES LITIGATION[1]

No. CIV.A.3:98–CV–1716–L, CIV.A.3:98–CV–1718–L, CIV.A.3:98–CV–1761–L, CIV.A.3:98–CV–1802–L, CIV.A.3:98–CV–1809–L, CIV.A.3:98–CV–1827–L, CIV.A.3:98–CV–1828–L, CIV.A.3:01–CV–0698–L, CIV.A.3:98–CV–1847–L, CIV.A.3:98–CV–1849–L, CIV.A.3:98–CV–1860–L, CIV.A.3:98–CV–1885–L, CIV.A.3:98–CV–1886–L, CIV.A.3:98–CV–1948–L, CIV.A.3:98–CV–1958–L, CIV.A.3:98–CV–1977–L, CIV.A.3:98–CV–1978–L, CIV.A.3:98–CV–2029–L, CIV.A.3:98–CV–2054–L, CIV.A.3:98–CV–2087–L, CIV.A.3:98–CV–2109–L, CIV.A.3:98–CV–2196–L, CIV.A.3:98–CV–2232–L, CIV.A.3:98–CV–2538–L.

United States District Court,
N.D. Texas,
Dallas Division.

March 31, 2003.

*Jacobs and William H. Rudluff.* After the court appointed lead plaintiffs and lead counsel in the case, Plaintiffs filed an amended consolidated complaint under the caption *"In re Capstead Mortgage Corporation Securities Litigation."*

Stanley Mandel & Iola, Dallas, TX, Robert M Roseman, Spector Roseman & Kodroff, Philadelphia, PA, for Marvin J. Netsky, Marks Brothers Inc., Eric Beane.

Christopher Lometti, Schoengold & Sporn, New York, NY, for The Carpenters and Joiners of America Local 3127 Pension Fund.

Jeffrey L. Kodroff, Robert M. Roseman, Marc R. Stanley, Spector Roseman & Kodroff, Philadelphia, PA, Roger L. Mandel, Stanley Mandel & Iola, Dallas, TX, Vincent R. Cappucci, Entwistle & Cappucci, New York, NY, for Jane C. Schwartz, Martin Friedman, Ronald Lewis.

Marc R. Stanley, Spector Roseman & Kodroff, Philadelphia, PA, for Ruth Wiggin, Robert Pope, Mary Walls, Gerald Streit, Shari Levy, Robert A. Staub, Theodore P. Laporte, W. John Maxey, Theodore Kaplan, Selma Kaplan Jack Goldstein, Henry Rosenberg.

Marc R. Stanley, Spector Roseman & Kodroff, Philadelphia, PA, Roger L. Mandel, Stanley Mandel & Iola, Dallas, TX, for Richard Kopelman, Frank Lanzillotti, Abram Weiss, Doris Harte.

Marc R. Stanley, Spector Roseman & Kodroff, Philadelphia, PA, Miles Tepper, Schoengold & Sporn, New York, NY, Robert M. Roseman, Spector Roseman & Kodroff, Philadelphia, PA, for Charles S. Zucker.

G. Paul Howes, Kirk B. Hulett, Thomas E. Egler, William S. Lerach, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA, Marc R. Stanley, Spector Roseman & Kodroff, Philadelphia, PA, Roger L. Mandel, Stanley Mandel & Iola, Dallas, TX, for Pearl Peckerman, Ira Monti, Ann Monti.

Martha A. Evans, Roberts & Smaby, Dallas, TX, Terrell W. Oxford, Susman Godfrey, Dallas, TX, for Med-Plan, Inc., Casey Ploszaj, Laura Kleinschmidt DeGrange, Lauren DeGrange.

---

Anthony Chu, James A Caputo, Spector Roseman & Kodroff, San Diego, CA, Kirk B Hulett, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA, Marc R Stanley,

Aaron Brody, Jules Brody, Tzivia Brody, Stull Stull & Brody, New York, NY, Joseph D. Ament, Much Shelist Freed Denenberg Ament & Eiger, Chicago, IL, Robert J. Hill, Roger F. Claxton, Claxton & Hill, Dallas, TX, for Mary Jean Nally, Thomas E. Nally.

Jules Brody, Stull Stull & Brody, New York, NY, Mel E. Lifshitz, Bernstein Liebhart & Lifshitz, New York, NY, Stanley Bernstein, Kreindler & Kreindler, New York, NY, for Howard Gunty, Inc., Yvonne Missry.

Fred T. Isquith, Wolf Haldenstein Adler Freeman & Herz, New York, NY, Michael D. Napoli, Robert E. Wolin, Kirkpatrick & Lockhart, Dallas, TX, for Robert Markewich.

Alfred G. Yates, Jr., Law Offices of Alfred G. Yates, Pittsburgh, PA, Marc R. Stanley, Stanley Mandel & Iola, Dallas, TX, William S. Lerach, Milberg Weiss Bershad Hynes & Learch, San Diego, CA, Steven E. Cauley, Cauley Geller Bowman & Coates, Little Rock, AR, for Lew G. Kachulis.

Robert J. Hill, Claxton & Hill, Dallas, TX, for Ralph Aker, Lorraine Love, Stephen Rozenfeld.

Roger F. Claxton, Claxton & Hill, Dallas, TX, for Irene Mohr, Mel Mohr.

Marc R. Stanley, Spector Roseman & Kodroff, Philadelphia, PA, Roger L. Mandel, Stanley Mandel & Iola, Dallas, TX, Marvin L. Frank, Rabin & Peckel, New York, NY, Sherri R. Savett, Todd Collins, Berger & Montague, Philadelphia, PA, for Teresa M. Grimm.

Gloria Ohsman North, Law Offices of Gloria Ohsman North, Boca Raton, FL, for Barry Kon.

Danny S Ashby, Robert H. Mow, Jr., Stephen G. Gleboff, Walter Graves Pettey, III, Hughes & Luce, Dallas, TX, David Allen Dodds, George W. Bramblett, Jr., Kerry McHugh Breaux, Noel M.B. Hensley, Haynes & Boone, Dallas, TX, Gerald C Conley, James L. Truitt, Timothy E. Taylor, Andrews & Kurth, Dallas, TX, James D McCarthy, Diamond McCarthy Taylor Finley, Bryant & Lee, Dallas, TX, Wendy Susan Leavitt, Steel Hector & Davis, Miami, FL, for Capstead Mortgage Corporation, Ronn K Lytle, Christopher T Gilson, Julie A Moore, Andrew F Jacobs, Andrew F Rudluff.

Danny S Ashby, Robert H. Mow, Jr., Stephen G. Gleboff, Walter Graves Pettey, III, Hughes & Luce, Dallas, TX, Gerald C Conley, James L. Truitt, Timothy E. Taylor, Andrews & Kurth, Dallas, TX, James D McCarthy, Diamond McCarthy Taylor Finley, Bryant & Lee, Dallas, TX, for William H. Rudluff.

Robert S. Summerhays, Weil Gotshal & Manges, Dallas, TX, for Ernst & Young.

### MEMORANDUM OPINION AND ORDER

LINDSAY, District Judge.

■ Before the court are Defendant Capstead Mortgage Corporation's Motion to Dismiss, filed February 20, 2001; and The Individual Defendants' Motion to Dismiss, filed February 20, 2001. After careful consideration of the motions, responses, replies, appendices,[2] and the applicable

---

**2.** Defendants have submitted an appendix and supplemental appendix in support of their motion to dismiss, and throughout their briefing refer to documents contained in the appendices. Generally the court cannot consider evidence beyond the pleadings in ruling on a Rule 12(b)(6) motion to dismiss; however, Defendants have submitted various papers which the court can consider in ruling on a motion to dismiss, without converting the motion into one for summary judgment. These include documents incorporated by reference in the Complaint, matters subject to judicial notice (such as filings with the SEC), stock prices, and matters of public record. *Love-*

law, the court **grants** Defendant Capstead Mortgage Corporation's Motion to Dismiss, and **grants** the Individual Defendants' Motion to Dismiss.

## I. Factual and Procedural Background

This is a consolidated securities fraud putative class action alleging fraud-on-the-market. Plaintiffs are individual persons or entities that purchased or otherwise acquired shares of Defendant Capstead Mortgage Corporation's ("Capstead" or "Company") common stock between April 17, 1997 and June 25, 1998 (the "Class Period"). Defendants are Capstead and five individuals who served as senior officers or directors of Capstead, or its subsidiary, Capstead, Inc.: Ronn K. Lytle ("Lytle"), Christopher T. Gilson ("Gilson"), Julie A. Moore ("Moore"), Andrew F. Jacobs ("Jacobs") and William H. Rudluff ("Ruduff") (collectively the "Individual Defendants").[3]

According to Plaintiffs' Amended Complaint,[4] Capstead is a Dallas-based real estate investment trust ("REIT") whose stock is publicly traded and listed on the New York Stock Exchange under the symbol "CMO." As a REIT, Capstead is not required to pay corporate income taxes as long as it distributes substantially all of its taxable income to its shareholders.

Capstead was formed in 1985. Initially, it structured and managed mortgage investments; however, in 1992, the company shifted its business strategy, and moved into mortgage-servicing. Mortgage servicing entails collecting from borrowers a monthly mortgage payment (the principal, interest and any amount that goes into escrow for taxes and insurance); remitting the principal and interest to entities that own the loans; managing the escrow accounts and payments from them (including, paying mortgage related expenses such as taxes and insurance, making advances to cover delinquent payments, contacting delinquent mortgagors and general loan administration). In addition, the Company manages the delinquency and foreclosure process on behalf of the mortgage investors. For this service, the mortgage servicer receives a small percentage of the outstanding principal balance. The ideal loan for a mortgage servicer lasts the entire term of the loan and is always paid on time.

During the Class Period, Capstead invested in mortgage-backed securities. At that time, much of the Company's earnings came from profits derived from its mort-

---

*lace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017–18 (5th Cir.1996); *Davis v. Bayless*, 70 F.3d 367, 371 n. 3 (5th Cir.1995); *In re CompUSA, Inc., Sec. Litig.*, Civ. A. No. 3:94–CV–1151–H, 1995 WL 811960, at *10 n. 14 (N.D.Tex. Oct.30, 1995).

**3.** During the Class Period, Lytle was Capstead's Chairman, President, Chief Executive Officer, and Chief Operating Officer; Gilson was President and Chief Operating Officer of Capstead, Inc. (the Company's mortgage-servicing subsidiary); Moore was Senior Vice President–Asset and Liability Management until March 1998, at which time she became Senior Vice President–Control, Treasurer, and Secretary; Jacobs was Senior Vice President–Control, Treasurer, and Secretary until March

1998, at which time he exchanged positions with Moore; and Rudluff was Executive Vice President–Servicing Administrator. Plaintiffs' Consolidated Amended Complaint for Violation of the Securities Exchange Act of 1934 (hereinafter "Pl.s' Am. Compl.") ¶ 17. The court refers to Capstead and the Individual Defendants collectively as "Defendants" unless otherwise stated.

**4.** As Defendants have moved to dismiss pursuant to Rule 12(b)(6), the court accepts as true the facts alleged in the complaint and construes them in the light most favorable to Plaintiffs. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 341 (5th Cir.2002); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406 (5th Cir.2001).

gage-servicing portfolio, which included fixed and adjustable-rate mortgage ("ARM") securities, as well as purchases of interest-only securities, which were entitled to receive the interest, but not the principal, from pools of mortgage-backed securities. Capstead also acquired through bulk purchases the rights to service mortgage loans originated by other financial institutions. In exchange for servicing the loans, Capstead received a contractual percentage of the outstanding monthly principal balance of the mortgage loans it serviced, as well as other ancillary revenues such as late fees. Capstead's investments in mortgage securities and its servicing of mortgage loans were subject to risks, including declines in interest rates resulting in higher prepayments of the mortgage loans underlying the Company's mortgage securities and the loans underlying its mortgage-servicing rights.

During 1996, the Company reported growing earnings and increased its quarterly dividends to shareholders from less than $0.30 per quarter to more than $0.55. The Company's stock increased from $14 to $16 per share in early 1996 to $22 to $25 per share a year later. Sometime in 1996, Capstead's stock price declined to about $19 per share because of market concerns about short-term interest rates and their effect on the Company's ability to maintain its growth in earnings and revenues. In April 1997, Defendants began making statements extolling the strength and diversification of the Company's portfolio and its increased investment in interest-only strip securities.

As Defendants reported growing financial results, with an increasing dividend payment in each quarter, they assured investors that despite interest-rate fluctuations, Capstead could generate a sustainable 20% return on equity and an 8% earnings-per-share growth rate because it had "carefully hedged against changing interest rates," and designed its portfolio to mix adjustable-rate mortgages with interest-only strips.

By late summer 1997, the mortgage industry grew concerned about a bond rally. Defendants represented to the investing public that Capstead's business was strong and could deliver stable growth despite volatility in interest rates because of its asset diversification. The Company also represented that its hedges were still working well and that its assets were properly valued. The Company maintained a high stock price through the end of 1997 and increased the dividend each quarter of that year.

In late April 1998, Capstead stated that increasing prepayments on mortgages might cause some impairment in the interest-only securities in future quarters. Management of the Company explained that if the 10–year U.S. Treasury rate were to decline to 5%, Capstead might have to take charges of up to $125 million against earnings. The Company also stated that its dividend would be lower than previous quarters and that future dividends might drop to as low as $0.40, but that it anticipated that the next dividend adjustment would be an increase.

Plaintiffs allege that on June 26, 1998, Capstead shocked the market, when Defendants announced that it had completed repositioning its mortgage securities portfolio in order to improve performance in future periods should long-term interest rates decline further. Lytle explained that because of the continued high level of mortgage prepayments and the possibility of further declines in long-term interest rates, the Company determined that it would be prudent to substantially reduce its exposure to mortgage prepayments. To that end, Capstead sold its entire $977 million investment in interest-only securities, and sold $659 million of its Fannie-

Mae/Freddie Mac ARM securities and $656 of its GinnieMae ARM securities. This repositioning resulted in non-operating losses totaling approximately $255 million. The Company further announced that it anticipated taking an impairment charge of approximately $45 million on its mortgage-servicing portfolio because of the continued prospect of high mortgage prepayment rates. Capstead further stated that its third-quarter dividend would be much lower than previously stated. Following these disclosures, the price of Capstead's stock fell sharply, and according to Plaintiffs, traded at $8–11/16 per share at the time this action was filed—well below the Class Period high of $27–13/16.

Plaintiffs allege that throughout the Class Period, Defendants represented to the investing public that Capstead (1) was uniquely well-positioned to generate strong steady earnings regardless of the direction of interest rates; (2) had protected itself from interest-rate changes by investing heavily in mortgage-backed securities; and (3) had properly positioned itself to achieve strong earnings-per-share growth in future years with corresponding growing quarterly dividend payments. Plaintiffs allege that such dividend payments were quite attractive to senior citizen investors because of their perceived safety. Plaintiffs allege that Defendants' representations were materially false or misleading because, *inter alia,* Capstead did not have a balanced portfolio that could generate steady earnings in virtually any interest-rate environment, and mortgage prepayments posed an extreme risk to the value of its mortgage securities. Plaintiffs further allege that in order to conceal the true condition of its financial condition and the ineffectiveness of its hedging strategy, Capstead misreported throughout the Class Period its net income, earnings-per-share, and value of its interest-only securities and mortgage-servicing rights.

Plaintiffs allege that as a result of Defendants' material misrepresentations and omissions, Capstead's stock was artificially inflated to a price as high as $27–13/16, enabling the Company to sell its common stock and Series B cumulative-convertible-preferred stock in a shelf offering and a Stockholder Investment Program for proceeds of $192.2 million, which it used to "support increased investments in mortgage servicing and mortgage securities." Plaintiffs further allege that the inflated price also allowed the officers to exchange their Dividend–Equivalent Rights ("DERS") during the Class Period for an inflated price of $23.25 per share and realize proceeds of more than $10.5 million.

Beginning on July 23, 1998, members of the purported class began filing lawsuits against Defendants in the Northern District of Texas, Dallas, Division. A total of twenty-four putative class action lawsuits were filed against Defendants and subsequently consolidated into one action.[5] Plaintiffs assert claims against Defendants for securities fraud under the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b–5 of the Securities Exchange Commission ("SEC") promulgated thereunder. Plaintiffs also assert a Section 20(a) claim against Lytle, Jacobs and Moore.

On July 12, 2000, the court appointed the following persons as Lead Plaintiffs:

---

**5.** On May 18, 2000, a single Plaintiff, Barry Kon, filed a lawsuit in the Southern District of Florida, styled *Kon v. Capstead Mortgage Corporation,* asserting claims solely against Capstead for federal securities fraud in connection with his purchase of shares of the Company's common stock between September 5, 1996 and June 25, 1998. The court addresses the Kon lawsuit at the end of this opinion.

Glenn and Betty MacDonald and the Mac-Donald Family Trust; Paul Jacobs and the Paul Jacobs Trust; KilPatrick Life Insurance Co.; Robert McKee and the McKee Trust; George and Mizue O'Hara; Zia Capital Corporation; Phillip and Mary Ann Woodard; and Francis M. Yans. On October 20, 2000, Plaintiffs filed a consolidated amended complaint. Defendants now move to dismiss Plaintiffs' Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6).

## II. Applicable Pleading Standards

### A. Introduction

 The standard for successfully pleading a securities fraud case, as will be subsequently illustrated, is stringent.[6] In fact, many will contend that it is too stringent (and perhaps they are correct) because it often leaves innocent shareholders who have been victimized by unscrupulous corporate officers and directors without an adequate remedy. The specificity and particularity required to assert a securities fraud cause of action are set forth in the PSLRA, and such requirements have been interpreted and applied by the United States Supreme Court and the Fifth Circuit Court of Appeals. Congress, if it so chooses, can set a different standard or rewrite legislation to nullify the effect of existing court decisions. This has not been done. The court is thus obligated to follow the law as set forth by the Supreme Court, the Fifth Circuit, and the applicable statutes and rules. The task of any court is to interpret and apply the law, not rewrite it. The court does not have the discretion to disregard existing precedent. Accordingly, regardless of how forcibly one may argue for less stringent standards, the court cannot succumb to such invitations. The court now sets forth the applicable pleading standards.

### B. Rule 12(b)(6)

A court cannot dismiss Plaintiffs' claims under Rule 12(b)(6) unless it appears beyond doubt that they can prove no set of facts entitling them to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Coates v. Heartland Wireless Communications, Inc.,* 26 F.Supp.2d 910, 913–14 (N.D.Tex. 1998)("*Coates I*"). In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir.1996). The court, however, will not accept conclusory allegations in the complaint as true. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir. 1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); *Robertson v. Strassner,* 32 F.Supp.2d 443, 445 (S.D.Tex. 1998); *Zuckerman v. Foxmeyer Health Corp.,* 4 F.Supp.2d 618, 621 (N.D.Tex. 1998). Likewise, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent dismissal under Rule 12(b)(6)." *Tchuruk,* 291 F.3d at 348 (citing *S. Christian Leadership Conference v. Supreme Court of Louisiana,* 252 F.3d 781, 786 (5th Cir.), *cert. denied,* 534 U.S. 995, 122 S.Ct. 464, 151 L.Ed.2d 381 (2001)).

### C. Section 10(b) of the Exchange Act

Plaintiffs assert claims pursuant to Section 10(b) of the Securities Exchange Act,

---

**6.** To prevent the abuse of federal securities laws by private plaintiffs, Congress enacted the PSLRA. *See Nathenson,* 267 F.3d at 406. The statute in effect increases the pleading requirements for private securities fraud plaintiffs. *See id* at 406 and 412.; *see also In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 973 (9th Cir.1999) ("Congress enacted the PSLRA to deter opportunistic private plaintiffs from filing abusive securities fraud claims, in part, by raising the pleading standards for private securities fraud plaintiffs.").

15 U.S.C. § 78j, as amended by the PSLRA. Section 10(b) of the Exchange Act makes it unlawful for a person to:

use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). In relevant part, Rule 10b–5 makes it unlawful for any person, directly or indirectly, to:

make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

 It is well-settled that to state a claim for securities fraud under these provisions, a plaintiff must allege (1) a misrepresentation or omission; (2) of a material fact; (3) made with the intent to defraud; (4) on which the plaintiff relied; and (5) which proximately caused the plaintiff's injury. *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir.2002); *Tchuruk*, 291 F.3d at 348; *Nathenson*, 267 F.3d at 406–407; *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir.1997); *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir.1994). Where a plaintiff alleges a "fraud on the market" theory, it is not necessary for the plaintiff to prove individual reliance on the false or misleading statement. *Nathenson*, 267 F.3d at 414; *Coates I*, 26 F.Supp.2d at 914 n. 1; *Zuckerman*, 4 F.Supp.2d at 621. Instead, a plaintiff may show that he indirectly relied on the statements by relying on the integrity of the market price of the stock. *Nathenson*, 267 F.3d at 414.

### D. Rule 9(b) and the PSLRA

 Because section 10(b) claims are fraud claims, the plaintiff must also satisfy the pleading requirements imposed by Fed.R.Civ.P. 9(b). *Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir.1994); *Tuchman*, 14 F.3d at 1067. Rule 9(b) requires certain minimum allegations in a securities fraud case, namely, the specific time, place, and contents of the false representations, along with the identity of the person making the false representations and what the person obtained thereby. *Melder*, 27 F.3d at 1100; *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir.1993). This application of the heightened pleading standard of Rule 9(b) provides defendants with fair notice of the plaintiffs' claims, protects them from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs. *Melder*, 27 F.3d at 1100; *Tuchman*, 14 F.3d at 1067.

 Likewise, the PSLRA requires that:

the complaint [...] specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1). In *Nathenson*, the Fifth Circuit stated:

The effect of the PSLRA in this respect is to, *at a minimum*, incorporate the standard for pleading fraud under Fed.R.Civ.P. 9(b). This statutory language appears to comport with this Court's relatively strict interpretation of Rule 9(b), which requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made,

and explain why the statements were fraudulent.

267 F.3d at 412 (emphasis in original) (internal quotations marks and citations omitted). Thus, to satisfy Rule 9(b) and the PSLRA, a plaintiff must plead facts and avoid reliance on conclusory allegations. *Tuchman,* 14 F.3d at 1067; *Coates I,* 26 F.Supp.2d at 915.

■ As noted above, when an allegation regarding an allegedly false or misleading statement is made on information and belief, the "the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). If a complaint fails to satisfy the pleading requirements of the PSLRA or Rule 9(b), the complaint must be dismissed. *Tchuruk,* 291 F.3d at 350; *Nathenson,* 267 F.3d at 412–13.

### E. Scienter Requirement

■ To survive a motion to dismiss, plaintiffs asserting securities fraud claims must "plead specific facts giving rise to a strong inference of scienter." *Nathenson,* 267 F.3d at 407. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Nathenson,* 267 F.3d at 408; *Lovelace,* 78 F.3d at 1018. A plaintiff may satisfy the scienter requirement based on allegations of intentional misconduct, *see Nathenson,* 267 F.3d at 409, or "severe recklessness," which "resembles a slightly lesser species of intentional misconduct." *Id.* at 408. The Fifth Circuit defines "severe recklessness" as

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that

the defendant must have been aware of it.

*Id.; see also Abrams,* 292 F.3d at 430 (quoting *Nathenson,* 267 F.3d at 408). Circumstantial evidence of conscious behavior or severe recklessness can support a strong inference of scienter. *See Abrams,* 292 F.3d at 430; *Nathenson,* 267 F.3d at 410. The court considers the totality of the facts and circumstances alleged to determine whether they raise the requisite strong inference of scienter. *See Abrams,* 292 F.3d at 432; *Nathenson,* 267 F.3d at 425. "[A]llegations of motive and opportunity to commit fraud, standing alone, are no longer sufficient to plead a strong inference of scienter," *see Nathenson,* 267 F.3d at 412; however, evidence of motive and opportunity may meaningfully enhance the strength of the inference of scienter where the totality of the allegations demonstrates conscious behavior or severe recklessness. *See id.* When a complaint fails to adequately plead scienter, dismissal is required. 15 U.S.C. § 78u–4(b)(3)(A); *Tchuruk,* 291 F.3d at 350; *Nathenson,* 267 F.3d at 407; *Coates v. Heartland Wireless Communications, Inc.,* 55 F.Supp.2d 628, 634 (N.D.Tex.1999) (*"Coates II "*).

### III. Analysis

Plaintiffs' section 10(b) and 10b–5 claims are based upon: (1) financial statements that were allegedly not prepared in accordance with generally accepted accounting principles ("GAAP"); (2) inadequate disclosures of risks associated with Capstead's business and investments; and (3) various allegedly false and misleading statements or omissions made by Defendants, or analysts based on statements made by Defendants. Defendants move to dismiss Plaintiffs' Amended Complaint, contending that it fails to state a claim upon which relief can be granted; fails to satisfy the particularity requirements of

Rule 9(b) and the PSLRA, and fails to allege sufficient facts demonstrating scienter. Defendants further contend that Plaintiffs' Amended Complaint presents classic claims of fraud by hindsight and mismanagement, which are not actionable as securities fraud. Lastly, they contend that the statements about which Plaintiffs complain are forward-looking, optimistic statements regarding future earnings and dividends and, therefore, not actionable as fraud. Plaintiffs respond that their complaint satisfies the pleading requirements of Rule 9(b) and the PSLRA, in that, it alleges with particularity facts showing that Defendants materially misrepresented and omitted information throughout the Class Period concerning Capstead's business, financial results, purported safe-dividend, and successful investment strategy. Plaintiffs further maintain that their complaint alleges sufficient facts to raise a strong inference of scienter.[7]

### A. Alleged Misrepresentations

#### 1. Allegations Relating to Accounting Fraud

##### a. Particularity

As previously stated, the first category of misrepresentations on which Plaintiffs rely relate to Defendants' alleged violation of GAAP. Specifically, Plaintiffs allege that Capstead and the Individual Defendants overstated net income, earnings per share, and assets by misreporting the value of Capstead's investments in interest-only securities and mortgage-servicing rights, and failing to follow GAAP in reporting changes in the fair value of these assets. Plaintiffs allege that Defendants over-

stated these assets by failing to recognize on its financial statements as charges-to-earnings the impaired value of Capstead's interest-only securities caused by adverse interest-rate declines and high mortgage prepayment rates. In similar fashion, they allege that Defendants failed to amortize its mortgage servicing rights in proportion to and over the period of estimated net-servicing income. *See* Pls.' Am. Compl. ¶ 35. The court concludes that the alleged misrepresentations based on violations of GAAP are insufficient because Plaintiffs have failed to allege with particularity facts: (1) supporting their conclusion that Defendants violated GAAP; and (2) giving rise to a strong inference that Defendants acted with the required state of mind.

 The court notes *sua sponte* that Plaintiffs' Amended Complaint does not *expressly state* that the allegations therein are based on information and belief; however, this does not necessarily mean that the complaint is exempt from the PSLRA heightened pleading requirements. Indeed, it is not unusual in securities fraud cases that allegations in the complaint are made on information and belief, rather than a plaintiff's personal knowledge. *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 235 F.Supp.2d 549, 570 (S.D.Tex.2002). If the allegations are *explicitly* based on information and belief, rather than a plaintiff's personal knowledge, the complaint will be subject to the heightened pleading requirements under the PSLRA. *See Tchuruk*, 291 F.3d at 351 (allegations that are not based on a plaintiff's personal knowledge are neces-

---

**7.** The court notes that both Plaintiffs and Defendants at times unnecessarily digress into the merits of this action. In deciding whether to grant a motion to dismiss, the court does not concern itself with the merits, but with whether a party has adequately pleaded facts, which if true, would entitle it to relief. More-

over, consideration of the alleged merits is totally immaterial if no underlying claim has been stated. In these type of cases, Plaintiffs must meet the threshold pleading requirements, and any discussion of the merits is quite beside the point.

sarily pleaded on "information and belief," although not labeled as such, and therefore subject to the heightened pleading requirements under 15 U.S.C. § 78u–4(b)(1)). The allegations of securities fraud in Plaintiffs' Amended Complaint are explicitly based on information and belief; therefore, the court concludes that the complaint is subject to the heightened pleadings requirements under the PSLRA, specifically, § 78u–4(b)(1), which requires that all facts supporting information and belief allegations be stated with particularity.

The court also notes that Plaintiffs' Amended Complaint is replete with general and speculative statements, conclusory allegations, improper argument, and opinions, which serve no discernible purpose other than to create an unnecessarily prolix complaint. The court is not criticizing Plaintiffs for making conclusory statements; however, the court holds Plaintiffs accountable for not providing the underlying facts to support those conclusory statements. For example, if an allegation is made that Defendants falsely "overstated their net income," *see* Pls.' Am. Compl. ¶ 35, supporting facts, if any exists, would not be difficult to set forth. All one has to do is state that for the first quarter of 1997, or whatever the relevant period, Defendants represented that their net income was "X amount" when in fact its net income was "Y amount," and, of course, if the "Y amount" alleged is based on information and belief, state with particularity the facts which support that belief. On a more mundane level, if a person alleged that another was "intoxicated," such a statement is a conclusion. The specific underlying facts to support such a conclusion would be that the person had bloodshot and glazed eyes; smelled of alcohol; staggered upon walking; repeated himself during the course of conversation; had slurred speech; and swayed back and forth when attempting to stand stationary. These would be facts from which one could conclude or infer that the individual was intoxicated.

 The court realizes that discovery has not taken place; however, there are other means to obtain documents and information. The court cannot understand why a securities fraud complaint simply cannot be alleged to show what *each person* did to violate the statute. The problem with Plaintiffs' Amended Complaint is that it fails to state with any degree of specificity the *underlying facts* necessary for the court to make the required inferences or assumptions. It is not sufficient to simply allege certain facts that support a final conclusion, when those "facts" themselves are conclusory; the PSLRA is satisfied only by facts, not conclusory allegations. "Facts" are objective and verifiable, or clearly warranted deductions from other facts, whereas conclusions are subjective and based on opinion, including deductions that may not be generally accepted. *Lemmer v. Nu–Kote Holding, Inc.,* 3:98–CV–0161–L, 2001 WL 1112577, at *6 (N.D.Tex. Sept.6, 2001) (citation omitted). The court does not know why the complaint is pleaded as such. If the facts are there to support a claim, it would seem that they could be simply stated. Instead, the circular approach taken by Plaintiffs is akin to going to the dictionary to ascertain the meaning of a word, only to be referred to another word, and further still to another word. By the time one has gone through the list of referenced words he or she has no better appreciation of the meaning of the original word than when the person commenced the search.

### b. Capstead's Interest–Only Investments

 Plaintiffs allege that Capstead failed to properly account on its financial statements the decreases in value of its interest-only securities as charges-to-earn-

ings, as required by GAAP. "The term generally accepted accounting principles . . . is a term of art encompassing a wide range of acceptable procedures, such that an ethical, reasonably diligent accountant may choose to apply any of a variety of acceptable accounting procedures when that accountant prepares a financial statement." *Lovelace*, 78 F.3d at 1020 (internal quotations and citation omitted). "[T]he failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir.1999); *see also Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir.1999); *accord Coates v. Heartland Wireless Communications, Inc.*, 100 F.Supp.2d 417, 430 (N.D.Tex.2000) (*Coates III*); *cf. Lovelace*, 78 F.3d at 1020 (holding that failure to follow GAAP, without more, is insufficient to establish scienter); *Fine v. American Solar King Corp.*, 919 F.2d 290, 297 (5th Cir.1990) ("We agree that the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information"). To remove the accounting practices about which they complain from the realm of acceptable choices, Plaintiffs must specifically and properly plead fraud. *See Coates III*, 100 F.Supp.2d at 430.

Plaintiffs' theory is that Capstead's interest-only securities were "held for sale in conjunction with mortgage banking activities as described in FASB Statement No. 65," and therefore should have been classified as "trading" securities. Nothing in the complaint factually supports this theory. In reviewing the complaint and appendices, it is clear that Capstead treated these assets as "available-for-sale," rather than trading securities, and disclosed its treatment of the assets on the relevant financial statements. Moreover, Plaintiffs set forth no allegations which would demonstrate that Capstead treated these assets otherwise. Classification of the assets is important because it determines how unrealized holding gains and losses are to be treated under GAAP. Financial Accounting Standards Board ("FASB"), Statement of Financial Accounting Standards ("FAS") No. 115 ¶¶ 12 and 13, which Plaintiffs cite in their Complaint, provides:

*Trading Securities and Available–For–Sale Securities*

12. Investments in debt securities that are not classified as held-to-maturity and equity securities that have readily determinable fair values shall be classified in one of the following categories and measured at fair value in the statement of financial position:

a. *Trading securities.* Securities that are bought and held principally for the purpose of selling them in the near term (thus held for only a short period of time) shall be classified as trading securities. Trading generally reflects active and frequent buying and selling, and trading securities are generally used with the objective of generating profits net short-term differences in price. Mortgage-backed securities that are held for sale in conjunction with mortgage banking activities, as described in FASB Statement No. 65, *Accounting for Certain Mortgage Banking Activities* shall be classified as trading securities. (Other mortgage-backed securities not held for sale in conjunction with mortgage banking activities shall be classified based on the criteria in this paragraph and paragraph 7.)

b. *Available-for-sale securities.* Investments not classified as trading securities (nor as held-to-maturity

securities) shall be classified as *available-for-sale securities.*

*Reporting Change, in Fair Value*

13. Unrealized **holding gains and losses** for trading securities shall be included in earnings. Unrealized holding gains and losses for available-for-sale securities (including those classified as current assets) shall be excluded from earnings and reported as a net amount in a separate component of shareholders equity until realized. Paragraphs 36 of FASB Statement No. 109, *Accounting for Income Taxes,* provides guidance on reporting the tax effects of unrealized holding gains and losses reported in a separate component of shareholders' equity.

Pls.' Am. Compl. ¶ 41 (emphasis in original); Defs.' App. at 335 (Ex. T). FAS No. 65 ¶ 1 describes "mortgage banking activities" as primarily consisting of two separate but interrelated activities: (a) the origination or acquisition of mortgage loans and the sale of the loans to permanent investors and (b) the subsequent long-term servicing of the loans. *See* Defs.' App. at 339 (Ex. V) (FAS No. 65 ¶ 1).

■ The GAAP requirements upon which Plaintiffs rely "require the substantial application of judgment to the totality of circumstances." *Lemmer,* 2001 WL 1112577, at *10. The court therefore concludes that Plaintiffs' statement that Defendants violated GAAP is in reality a conclusion, rather than a fact. Because Plaintiffs' allegations of GAAP violations are made on information and belief, rather than personal knowledge, they must state with particularity all facts on which that belief is formed, 15 U.S.C. § 78u–4(b)(1), to permit an evaluation of whether that information is enough to support a reasonable belief in their conclusion. *Lemmer,*

2001 WL 1112577, at *10. This they have failed to do.

■ Plaintiffs do not clearly and succinctly state how Defendants accounted for their interest-only securities. Instead, they allege that Capstead failed to properly recognize the value of its interest-only securities by failing to recognize "much of" its $255 million charge-to-earnings until 2ndQ–98. Pls.' Am. Compl. ¶ 44. Plaintiffs do not allege what portion of this amount was attributed to the impaired value of the Company's interest-only securities. In any event, the complaint is devoid of facts which show that Capstead's deferred recognition of its $255 million charge-to-earnings violated GAAP. Plaintiffs take the position that Capstead's interest-only securities were "trading securities"; however, they allege no facts to support this assertion. For example, Plaintiffs allege no facts demonstrating that Capstead bought its interest-only securities and held them principally for the purpose of selling them in a short period of time. Plaintiffs allege no facts showing that Capstead actively and frequently purchased and sold the interest-only securities for the purpose of generating profits net short-term differences in price. Plaintiffs moreover allege no facts which show Capstead's interest-only securities were held for sale in conjunction with mortgage banking activities, as described in FAS No. 65. There are no allegations that Capstead acquired its interest-only securities through either the purchase or origination of mortgage loans, or that it sold any such loans to permanent investors with a retained interest in servicing those same loans. Plaintiffs have failed to allege with particularity facts which demonstrate that Defendants were required to include the alleged impaired value of its interest-only securities in Capstead's earnings at an earlier time during the Class Period. Plain-

tiffs have therefore failed to allege facts which demonstrate a violation of GAAP based on a failure to properly recognize interest-only impairments.

■■■ In their response to Defendants' motions to dismiss, Plaintiffs contend that Capstead's interest-only investments should have been classified as trading securities because the Company purchased $4.5 billion of mortgage assets and sold $2 billion of mortgage assets during 1997. Pls.' Resp. at 27. This allegation alone, however, is insufficient for the court to infer that Capstead was a "trader" of securities within the meaning of FAS No. 115, or that the interest-only securities at issue meet the definition of trading securities set out in FAS No. ¶ 12(a). First, it fails to establish that the interest-only securities at issue were "bought and held principally for the purpose of selling them in the near term." Second, as Capstead points out, purchasing and selling mortgage assets is wholly consistent with its role as a mortgage REIT—that is, investing in mortgage assets and periodically adjusting its portfolios to try and achieve better long term portfolio results. This is not the same as trading securities with the objective of generating profits on short-term difference in prices as described in FAS No. 115 ¶ 12(a). *See* Pls.' Am. Compl. 41; Defs.' App. at 334–335 (Ex. T).

■■■ Plaintiffs allege that even if Defendants were correct in their classification of the interest-only securities as "available-for-sale," Capstead's accounting nevertheless "violated GAAP, which prohibits deferral of net-income recognition in this instance because the Company's leveraged condition meant it was in no position to hold the related investment." Pls.' Am. Compl. ¶ 46. In other words, Plaintiffs contend that because of Capstead's high leverage, it was required to recognize losses with respect to its interest-only securities in accordance with GAAP. Plaintiffs do

not specify the accounting principle which they contend was violated, or allege any specific facts regarding Capstead's "leveraged" condition to show that it was not in a position to hold the interest-only investments during the Class Period. These allegations do not satisfy the pleading requirements of Rule 9(b) or the PSLRA. Moreover, such conclusory allegations are insufficient to support a claim for securities fraud.

### c. Capstead's Mortgage–Servicing Rights

Plaintiffs contend that Capstead failed to properly account for retained interests in securitizations. They allege that Capstead abused the accounting rules for amortization and impairment of the cost of its mortgage-servicing rights to understate expenses, and thereby, overstate earnings. In support of this allegation, Plaintiffs cite to FAS No. 125 ¶¶ 37e and f, which state:

e. Account separately for rights to future interest income from the serviced assets that exceeds contractually specified servicing fees. Those rights are not servicing assets. They are financial assets, effectively interest-only strips to be accounted for in accordance with paragraph 14 of this Statement.

f. Subsequently measure servicing assets by amortizing the amount recognized in proportion to and over the period of estimated net servicing income-the excess of servicing revenues over servicing costs (paragraph 13).

Pls.' Am. Compl. ¶ 48. Defendants contend that the first accounting standard (FAS No. 125 ¶ 37e) is inapplicable because Plaintiffs have mischaracterized Capstead's mortgage-servicing rights as "retained interest in securitizations." They explain that Capstead purchased virtually all of its mortgage servicing rights,

and received a contractually-specified servicing fee. They therefore conclude that there were no "rights to future interest income" that exceeded contractually specified servicing fees on Capstead's mortgage servicing rights.

■ Plaintiffs' allegations with respect to these assets are also based on information and belief; therefore, they must state with particularity all facts that form the basis of their belief that Capstead violated GAAP in accounting for its mortgage-servicing rights. Plaintiffs have failed to do so. To the extent Plaintiffs allege that Capstead failed to account separately for "rights to future interest income," they allege no facts which show that Capstead's mortgage-servicing rights were in fact "rights to future interest income," rather than servicing assets. Implicit in Plaintiffs' assertion is an assumption that Capstead's mortgage-servicing rights were "trading securities," that is, held for sale in conjunction with mortgage banking activities. Plaintiffs, however, allege no facts which show that Capstead obtained its mortgage-servicing rights through "mortgage banking activities." More specifically, Plaintiffs fail to allege facts which show that Capstead acquired its mortgage-servicing rights through the process of (1) originating or acquiring mortgage loans, (2) selling them to permanent investors, and (3) retaining mortgage servicing rights in those loans, thereby entitling it to future interest income from those loans. Plaintiffs have failed to allege with particularity facts to support its conclusion, based on information and belief, that Capstead was required to use this accounting principle in with respect to its mortgage-servicing rights. Plaintiffs have therefore failed to allege facts showing an actual violation of GAAP on this ground.

■ Plaintiffs also allege that Defendants violated GAAP, specifically FAS No. 125 ¶ 37f, by failing to amortize its mortgage-servicing rights in proportion to and over the period of estimated net-servicing income; however, Plaintiffs have failed to plead facts showing how or why Capstead's accounting of these assets was improper. Moreover, Plaintiffs have failed to allege with particularity facts to support its belief that Capstead failed to properly amortize these assets. Plaintiffs allege no facts which show the fair value of the mortgage-servicing rights, the price paid for these assets, the principal balance of the underlying loans serviced, the interest rates of the underlying loans, the estimated net-servicing income, servicing revenues, servicing costs, servicing losses, and the run-off rate of the mortgage loans. Plaintiffs have failed to allege with particularity facts to support its allegation, based on information and belief, that Defendants violated GAAP by failing to account properly for any alleged impairment of Capstead's mortgage-servicing rights.

### d. *Defendants' State of Mind*

■ Plaintiffs moreover have failed to allege with particularity facts that would demonstrate knowing or severely reckless publishing of materially false information with respect to Capstead's accounting of its interest-only securities and mortgage-servicing rights. Plaintiffs allege no facts which demonstrate that Capstead knew that its method of accounting for these debt securities violated GAAP, or that its method of accounting was "an extreme departure from the standards of ordinary care." *Nathenson,* 267 F.3d at 408.

■ Plaintiffs intimate that the amount of impairment that Capstead ultimately recorded in the second quarter of 1998 gives rise to a strong inference of fraud. Assuming the amount of the impairment to be true, such allegation sounds in mismanagement or negligence, both of which are insufficient to give rise to a

strong inference of scienter. *See Tuchman*, 14 F.3d at 1070 ("corporate mismanagement does not, standing alone, give rise to a 10b–5 claim"); *see Nathenson*, 267 F.3d at 408 n. 7 (negligence alone is insufficient to support 10b–5 liability) (citation omitted). Moreover, arguing that an impairment should have been recognized at a point earlier than reported is alone insufficient to give rise to a strong inference of fraud. *See Coates II*, 55 F.Supp.2d 628, 1999 WL 476839, *8 (questioning timing of write-down does not provide the required pleading of strong inference of fraud). As pleaded, Plaintiffs' allegations of accounting fraud based on Defendants' non-compliance with or violation of GAAP do not sufficiently demonstrate conscious misbehavior or severe recklessness. Plaintiffs have therefore failed to plead facts giving rise to a strong inference of fraud based on Defendants' non-compliance with GAAP.

### 2. Allegations Relating to Capstead's Failure to Adequate Warn

■ Plaintiffs allege that Defendants failed to adequately disclose the risks associated with its business—specifically, the potential losses inherent in its investment in mortgage securities and mortgage servicing rights. Plaintiffs allege that Capstead's "boilerplate" risk disclosures failed to adequately warn them of all possible risks associated with the Company's mortgage securities and mortgage-servicing rights. In this regard, Plaintiffs allege that Defendants failed to disclose that (1) the Company was not keeping up with the run-off rate of the underlying mortgages that it serviced, Pls.' Am. Compl. ¶ 55; (2) by early 1997, actual prepayments had risen to levels that were adversely affecting Capstead's interest-only investments and mortgage-servicing rights revenues, *id.* ¶ 56; (3) the Company's hedge program had failed, *id.* ¶ 57; and (4) the decline in interest rates on underlying mortgage loans had resulted in significant prepayments and made its remaining investments in mortgage securities extremely susceptible to a further diminution in value, which Defendants failed to recognize in its 1997 and 1stQ–98 financial statements. *Id.* ¶ 59. None of these allegations is accompanied by supporting facts, Moreover, the allegations are made on information and belief, and Plaintiffs have failed to allege with particularity the facts on which their belief for each of the allegations is formed. Plaintiffs allegations in this regard are insufficient to allege an actionable misrepresentation or omission for securities fraud.

Not only are Plaintiffs' allegations unsupported by underlying facts, the record reveals that they tend to mischaracterize information contained in publicly filed documents. The court has reviewed the relevant public filings and determines that they adequately warned investors of exactly the risks Plaintiffs contend were not disclosed. Capstead disclosed the risks associated with its business of investing in mortgage securities and mortgage servicing loans, and described how those risks could affect its investments in interest-only securities and its mortgage servicing rights. With respect to interest-only mortgage securities, Capstead disclosed both before and during the Class Period that in a falling interest rate environment, prepayments on the underlying mortgage loans generally will be higher, thereby reducing or even eliminating overall returns on these securities, and sustained periods of high prepayments could result in losses, Defs.' App. at 43, 64, 85, 108, 157, and 182. With regard to its mortgage-servicing rights, Capstead stated:

> [L]ower interest rates will spur prepayments thus reducing the time the Company can service the related loans. Sustained periods of high prepayments can result in losses on the Company's investment in mortgage-servicing rights, because this investment is evaluated for impairment on a disaggregated basis

and impairment charges are necessary if the amount for an individual servicing stratum exceeds its fair value.

*Id.* at 64, 85, 108, 157, and 182. The Company also disclosed that changes in interest rates could impact its earnings, because they depend, in part, on the difference between the interest received on mortgage investments and the interest paid on related short-term borrowings. *Id.* at 42, 63, 84, 107, 156, and 181. It further disclosed that unfavorable interest rates could reduce the Company's earnings and dividends. *Id.* at 14, 128. In relaying the risks associated with its business, Capstead stated:

> Another effect of changes in interest rates is that as interest rates decrease, the rate of prepayment of mortgage loans underlying mortgage investments generally increases. To the extent the proceeds of prepayments on mortgage investments cannot be reinvested at a rate of interest at least equal to the rate previously earned on such investments, earnings may be adversely affected.

*Id.* at 42–43, 63, 84–85, 107, 156.

 A reasonable investor could not have read Capstead's annual and quarterly reports without realizing that, despite the use of balancing its mortgage investments and mortgaging servicing portfolios to minimize the impact of fluctuating interest rates, a significant downturn in interest rates could decrease the value of the mortgage securities and mortgage servicing rights and decrease earnings. *See Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir.1996). Plaintiffs seem to be disgruntled because Defendants did not disclose in dollars and cents the "potential losses" inherent in Capstead's business;

however, a corporation "is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir.1993). Silence is not "misleading" unless there is a separate duty to disclose, *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), and "a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information." *Chiarella v. United States*, 445 U.S. 222, 235, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980).

 Even if Capstead had a duty to disclose additional information so as not to make its representations false or misleading, the complaint alleges no facts which demonstrate that the failure to disclose any such information was the result of conscious behavior, or an extreme departure from the ordinary standard of care, which is required to adequately plead scienter under the PSLRA. Aside from conclusory allegations, Plaintiffs allege no facts which demonstrate that Defendants disseminated incomplete, inaccurate, or misleading information, or that any such information was disseminated with scienter.

### 3. False and Misleading Statements or Omissions

#### a. Presentation of Allegations in Complaint

The difficulty that this court has in assessing whether the alleged fraudulent statements or omissions meet the pleading requirements under Rule 9(b) and the PSLRA lies in the manner in which the allegations are set out in Plaintiffs' Amended Complaint.[8] The alleged mis-

---

8. Plaintiffs' fifty-page complaint is by no means a model of clarity, but instead is a document replete with circular statements. Indeed, the simple and easiest thing for the court to have done would have been to deny the motions to dismiss with no explanation, rather than expend considerable hours of time on their resolution. Such an approach, however, although employed by some courts, is inconsistent with the court's duty to fully

representations and omissions are broadly organized into six sections arranged in chronological order according to the dates on which they were made.[9] In each paragraph that purports to contain a misrepresentation or omission, the complaint identifies the alleged statements or omissions, pleads the time, place, and content of the false representation, and in some cases attempts to identify the speaker. All explanations regarding how or why the alleged statement is misleading is reserved for the last paragraph of the section addressing a particular series of statements. By way of example, the court recites the allegations set forth in the first group of statements (¶¶ 60–66) which Plaintiffs assert were false and misleading when made:

> 60. Beyond Capstead's financial fraud, defendants made the following misleading statements during the Class Period. On 4/17/97, Capstead reported "record" net income of $37,388,000—or $.64 per share—for the first quarter (ended 3/31/97):
>
>> Addressing the results for the first quarter of 1997, Ronn Lytle, chairman and chief executive officer, remarked, "Improved interest spreads on the Company's investments in mortgage securities and a larger investment portfolio", together with improved mortgage servicing results, contributed to significantly higher net income compared to the same quarter in 1996. Our investment decision during the second quarter of 1996 to modestly

reduce our commitment to adjustable-rate mortgage securities and to increase our investment in interest-only mortgage securities also improved profitability during the first quarter of 1997.

> 61. After releasing the 1stQ–97 results, CEO Lytle and VP–Control/Treasurer Jacobs spoke to large shareholders, analysts, and stockbrokers about the Company's business and prospects, assuring them that:
>
> • the mortgage-servicing portfolio was strong and productive, which would lead to servicing profits growing by 15% and overall profits growing by 8% in 1997.
>
> • their decision to increase investment in interest-only securities would benefit future results and provide a hedge against the interest-rate risk associated with adjustable-rate products, leading to earnings and dividend growth in future quarters.
>
> • earnings and dividends would continue to increase in 1997 and 1998, and in future quarters regardless of whether interest rates increased or decreased, because Capstead was carefully hedged against changing interest rates.
>
> • the Company was on track to earn EPS of $2.35 in 1997 and $2.55 in 1998.

> 62. On 4/18/97, PaineWebber issued a report, written by analyst Gary Gordon,

---

and fairly discharge its obligations to the litigants.

**9.** The first section encompasses statements allegedly made by Lytle and Jacobs, or analysts based on statements made by them, between April and May 1997. Pls. Am. Compl. ¶¶ 60–66. The second section includes statements allegedly made by Lytle and Jacobs, and analysts in July 1997. *Id.* ¶¶ 68–71. The third section identifies statements allegedly made by Lytle and Jacobs, and analysts between August and September 1997. The fourth section encompasses statements allegedly made by Lytle and Jacobs and analysts between October and December 1997. ¶¶ 79–87. The fifth section sets forth statements allegedly made by Lytle, Jacobs and analysts between January and March 1998. *Id.* ¶¶ 89–97. The sixth section includes statements allegedly made by Lytle and Moore between April and June 1998. *Id.* ¶¶ 99–107.

which was based on and repeated information provided by Lytle and Jacobs and forecast 1997 EPS of $2.35 and 1998 of $2.55:

WE REITERATE OUR ATTRACTIVE RATING

Our price target one year out is $27, based on our "earnings yield spread (EYS) valuation model. Our combined forecasted stock appreciation and 11% dividend yield target suggests a 30–35% total return".

We feel confident with the company's assertion of no dividend cuts from its current $2.32 annual rate during the year. Our confidence stems from the fact that CMO has, over the last few years, carefully hedged against changing interest rates by building a portfolio of assets with different rate characteristics.

63. On 5/7/97, PaineWebber announced it had added Capstead to its Focus List:

Designed to maximize potential returns and minimize losses, the Focus List is a dynamic, theoretical portfolio of no more than 30 carefully selected stocks. Although derived from those stocks rated buy or attractive by PaineWebber Research, the Focus List itself is developed by a committee made up primarily of senior Paine-Webber PCG professionals who employ stringent selection criteria based on fundamental, quantitative and technical analysis. A stock is removed from the list when one of two things happens: the PaineWebber analyst downgrades the stock, or the propriety Stop–Loss discipline developed by the Focus List committee indicates that the price threshold has been violated.

Capstead Mortgage, based in Dallas, is a mortgage investor in a REIT form specializing in insured home mortgage loans. The company owns more than $5 billion mortgage investments and services nearly $40 billion of loans. For 1997, PaineWebber forecasts earnings of $2.35 per share and for 1998, $2.55 per share.

64. On 5/13/97, Capstead filed a shelf-offering registration for up to $142.5 million of common and preferred stock. The common-stock prospectus stated:

Capstead Mortgage Corporation (the "Company") hereby offers participation in its stockholder Investment Program (the "Program"), as amended and restated through May 1, 1997. The Program is designed to provide investors with a convenient and economical way to purchase shares of the Company's Common Stock, par value $.01 per share ("Common Stock"), and to reinvest all or a portion of their cash dividends in additional shares of Common Stock, in most cases at a discount to the market price. Participants in the Program and interested investors may:

● Automatically reinvest cash dividends on all or a portion of their shares.

● Invest by making optional cash payments at any time up to a maximum of $10,000 per month, regardless of whether the participants' dividends are being reinvested.

● Make an initial cash investment up to a maximum of $10,000.

● Invest by making an initial cash investment in excess of $10,000, or optional cash payments in excess of $10,000 per month, subject to permission of the Company, regardless of whether the participants' dividends are being reinvested.

65. In the second week of 5/97, Lytle and Jacobs spoke to Brett Pope of SouthWest Securities and Eric Boyce of First Dallas Securities. They told the

analysts that the Company had developed its investment portfolio to generate income and dividends even in adverse interest-rate climates, and that business was strong and on track to report growing earnings in 1997 and 1998. Pope and Boyce were later interviewed by the *Dallas Business Journal* and their statements, which were based on and repeated statements by Lytle and Jacobs, were reported to the public on 5/23/97:

As for Capstead, the company is a victim of market overreaction to interest rates, Pope said in a May 21 interview.

"They're a very strong, very balanced company right now," he said. "Sooner or later, the market will understand that."

First Dallas Securities also rates Capstead stock as a "buy" and considers it undervalued.

"They have an investment portfolio that helps them generate income in adverse interest-rate climates," said Eric Boyce, vice president for First Dallas.

66. During 2ndQ–97, Capstead raised $43.9 million in stock sales—more than 90% from the sale of common stock and the remainder in preferred stock—thereby benefitting from the inflation in its stock price caused by Lytle's and Jacob's false statements. This amount compared to only $6 million raised in 2ndQ–96.

67. The positive statements by Lytle and Jacobs about Capstead between April and May 1997 were each false and misleading when made because:

(a) the Company did not have a balanced portfolio that could generate steady earnings in virtually any interest-rate environment, and mortgage prepayments posed an extreme risk to the value of its interest-only strip securities if rates were to decrease even moderately. Thus, defendants knew that falling rates would adversely affect future results;

(b) Capstead's core profitability was being hurt by interest-rate declines, which were being disguised by representations that its hedges were working well and by its manipulation and falsification of its asset valuations, especially for its interest-only securities, as detailed ¶¶ 53–59.

(c) Capstead's increasing investment in interest-only strip securities was not helping its business. Rather, it was causing it to have a much higher exposure to losses should interest rates decline and defendants were concealing ongoing, current losses on its interest-only securities through the falsification of its financial results as described in ¶¶ 35–52.

(d) During 1997 interest-rate declines were crippling the Company's current results and its ability to pay future dividends. Thus, there was no reasonable basis for Lytle's and Jacobs's assurances that Capstead had positioned itself in such a manner as to permit dividend payments to increase;

(e) Capstead's portfolio was not hedged against interest-rate risk because the spreads between its borrowing costs for capital and the interest it earned from investments were declining;

(f) The Company was not able to deliver stable earnings through asset diversification and sales. Instead was manipulating its results by selling profitable investments for one-time gains while retaining assets that were impaired and not recog-

nizing the impairment, causing Capstead to violate GAAP by carrying impaired assets on its books;

(g) Lytle and Jacobs lacked a good-faith basis for predicting that Capstead's dividends would continue to grow because impaired assets would have to be written down, resulting in declining earnings and quarterly dividends;

(h) Defendants never properly discussed the Company's interests in retained residual interests in securitization or the associated risks with this investment in a non-misleading manner;

(i) As a result of these negative factors, Lytle and Jacobs knew that the 1998 and 1999 EPS forecasts being made by and for Capstead were false when made because they were unachievable;

(j) Quarterly income continued to decline due to the impact of increased mortgage-prepayment rates which decreased the net-interest margins on mortgage securities and put pressure on earnings from mortgage servicing;

(k) Narrow and inverted spreads between the 10–year Treasury rate and one-month London Interbank Offering Rate ("LIBOR"), which is the interest rate offered by a group of London banks for dollar deposits, and is used as a base index for setting rates of many adjustable rate mortgages, created an extremely difficult environment for Capstead's growth and profitability notwithstanding and hedges; and

(l) In order to maintain its long-term grown, it was imperative that Capstead had access to capital markets. But Lytle and Jacobs failed to disclose that capital growth would be substantially less in 1998 than in 1997 due to the then-current interest rate environment.

Pls.' Am. Compl. ¶¶ 60–67. In this series of statements, the first six paragraphs, ¶¶ 60–66, purport to set forth the alleged false and misleading statements, and the seventh paragraph, ¶ 67, purports to set forth in twelve subparts the reasons why such statements are false or misleading. Paragraph 67, however, does not (1) *specify or point out* which of the various statements mentioned in the preceding six paragraphs are false or misleading, or (2) articulate how and why *any particular statement* in the six preceding paragraphs is false or misleading.[10] This approach is systematic of the allegations asserted throughout the complaint under the heading "The Company's False and Misleading Statements During the Class Period." The court does not criticize Plaintiffs for setting forth in separate paragraphs their reasons why a series of statements are false or misleading; however, in doing so, they should identify the particular statement they contend is false and misleading and the reason why that statement is false or misleading. Attempting to overwhelm the court with conclusory, garrulous and

10. Instead, the complaint makes a vague and general statement that the "positive statements" by Lytle and Jacobs about Capstead between April and May 1997 were false and misleading, and then purports to give reasons why such "positive statements" were false and misleading when made. Because Plaintiffs do not specifically identify what statements they contend are "positive statements," the court is unable to determine whether any such statements are material or actionable, much less false or misleading. Moreover, many of the alleged false or misleading statements identified in the complaint were made by analysts or reported in newspapers and, as will be discuss later, are in this case insufficient to state a claim for securities fraud.

esoteric allegations simply does not get the job done.

### b. Allegations Based on Group Pleading

 Plaintiffs have failed to satisfy Rule 9(b) and the PSLRA with respect to all purported misrepresentations or omissions that rely on "group pleading" and "group-published documents." Before the adoption of the PSLRA, the "group pleading" doctrine created the presumption that the senior executives of a corporation may be held personally liable for misrepresentations or omissions contained in public statements attributed to or issued by the corporation. *In re Silicon Graphics, Inc. Sec. Litig.*, 970 F.Supp. 746, 759 (N.D.Cal. 1997). Although there exists some debate in this district whether the group pleading doctrine survived the enactment of the PSLRA, the majority of the judges who have addressed the issue has come to the resounding conclusion that it does not. *See Kunzweiler v. Zero.Net, Inc.*, No. Civ. A. 3:00–CV–2553–P, 2002 WL 1461732, at *13 n. 15 (N.D.Tex. July 3, 2002); *Lemmer*, 2001 WL 1112577, at *7 (N.D.Tex. Sept.6, 2001) ("The group pleading doctrine is inconsistent with the particularity requirements of the PSLRA . . . .") (Lindsay, J.); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, No. Civ. A. 4:00–CV–355–Y, slip op. at 6 (N.D.Tex. March 12, 2001) ("The Court initially finds that Plaintiffs' complaint fails because of its reliance on group pleading.") (Means, J.); *Zishka v. American Pad & Paper Co.*, No. Civ. A. 3:98–CV–0660–M, 2000 WL 1310529, at *1 (N.D.Tex. Sept.13, 2000) ("[T]his Court rejects the notion of 'group pleading,' and 'group publication' and concludes that such concepts . . . did not survive the adoption of the PSLRA.") (Lynn, J.); *Calliott v. HFS, Inc.*, No. Civ. A. 3:97–CV–0924–L, 2000 WL 351753, at * 5 (N.D.Tex. March 31, 2000) (dismissing complaint based, in part, on plaintiffs' use of group pleading)

(Lindsay, J.); *Branca v. Paymentech, Inc.*, No. Civ. A. 3:97–CV–2507–L, 2000 WL 145083, at *8 (N.D.Tex. Feb.8, 2000) (same) (Lindsay, J.); *Coates I*, 26 F.Supp.2d at 916 ("The PSLRA codifies a ban on group pleading.") (Fitzwater, J.). Thus, the PSLRA requires plaintiffs to "distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud." *Schiller v. Physicians Resource Group, Inc.*, No. 3:97–CV–3158–L, 2002 WL 318441, at *5 (N.D.Tex. Feb 26, 2002) (Lindsay, J.) (citing *In re Silicon Graphics, Inc.*, 970 F.Supp. at 752 (emphasis added)).

The court is aware of *Zuckerman v. Foxmeyer Health Corp.*, in which the court permitted securities fraud plaintiffs to rely on the group pleading presumption for general statements or press releases issued by the corporation, 4 F.Supp.2d at 626 n. 4 ("To the extent that Plaintiffs rely on group pleading for general statements or press releases issued by the corporation, the Court finds the complaint sufficient to survive a motion to dismiss"); however, the court respectfully disagrees with the reasoning applied in that case and results therein reached. The court simply finds the group pleading doctrine irreconcilable with the PSLRA's mandate that plaintiffs plead specific facts as to each act or omission by the defendant. *See Barrie v. InterVoice–Brite, Inc.*, No. Civ. A. 3:01–CV–1071–D, 2002 WL 1841631 (N.D.Tex. Aug.8, 2002) (citation omitted) (Fitzwater, J.). Frankly, this is an issue that needs to be resolved at the appellate level because the court remains convinced that the group pleading doctrine is inconsistent with the purpose of the PSLRA and the pleading standards therein set forth.

With few exceptions, Plaintiffs' Amended Complaint is replete with instances of such group pleading. For example, the complaint repeatedly asserts that "Lytle

and Jacobs" or "Lytle and Moore" or "Capstead" made false or misleading statements when they spoke to, or during conferences calls to, shareholders, analysts, money and portfolio managers and others, *see* Pls.' Am. Compl. ¶¶ 61, 64, 65, 70, 73, 79, 80, 82, 90, 93, 99, 101, 104, 106; however, Plaintiffs fail to identify any statements or omissions attributable specifically to either Lytle, Jacobs, or Moore. The PSLRA and Rule 9(b) require Plaintiffs to identify the particular individual who made the misstatement or omission. Plaintiffs cannot avoid the bar on group pleadings simply by identifying constituents of a group of defendants in rote and conclusory fashion. Likewise, Plaintiffs cannot satisfy Rule 9(b) by attributing statements or omissions to the corporation without any identification of the officer or director responsible for making the statement. *See Coates v. Heartland Wireless Communications, Inc.,* 55 F.Supp.2d 628, 633 n. 3 (N.D.Tex.1999) (*"Coates II"*) (finding statements attributed solely to corporation insufficiently particular under Rule 9(b) and the PSLRA). The court concludes that Plaintiffs have failed to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA with respect to statements or omissions contained in paragraphs 61, 64, 65, 70, 73, 79, 80, 82, 90, 93, 99, 101, 104, 106 of Plaintiffs' Amended Complaint.

### c. *Statements by Analysts or Third Parties*

 Plaintiffs' Amended Complaint also attempts to plead securities fraud based on allegedly false and misleading statements made by analysts or other third parties in independent reports, or some form of print media, and disseminated to the public. *See* Pls.' Am. Compl. ¶¶ 62, 63, 65, 68, 71, 74, 75, 76, 81, 83, 84, 91, 92, 94, 102, 105. The court finds these alleged statements insufficient because they are unaccompanied by facts which

demonstrate their accuracy or Defendants' involvement or control in their preparation. Moreover, as recently determined by one court in this district: "a plaintiff cannot meet the requirements of the PSLRA and Rule 9(b) merely by pleading the specific time, place, and contents of misleading statements by a specifically identified analyst. Rather, to hold a defendant liable for misleading statements published by a third party, the plaintiff must at least identify the defendant who provided the information that the third party made public to the market." *Barrie,* 2002 WL 1841631, * 3; *see also Suna v. Bailey Corp.,* 107 F.3d 64, 72–73 (1st Cir. 1997) (holding analysts statements insufficient to satisfy particularity requirements because plaintiffs failed to identify with specificity the statements made by a particular defendant or describe how those statements were false or misleading). In none of the paragraphs alleging statements attributed to analysts or other third parties do Plaintiffs specify any particular statement that Lytle, Jacobs or Moore made, identify which of the three made a particular statement, state when and where the statement was made, and what the speaker obtained thereby. *See Barrie,* 2002 WL 1841631, *4. Conclusory allegations that an analyst's statements were "based on" or "repeated" unspecified statements or information by Lytle and Jacobs or Lytle and Moore, or were based on "conversations with" those individuals, are inadequate to satisfy the particularity requirements of the PSLRA and Rule 9(b).

### d. *Certain Statements Not Actionable*

 Aside from the aforementioned pleading deficiencies, the court also notes that many of the statements alleged in the complaint that are attributable to "Lytle and Jacobs" or "Lytle and Moore" are not actionable. For example, several of the statements about which Plaintiffs complain

may be characterized as historical information for which (with the exception of alleged violations of GAAP) the accuracy is not contested; general optimistic statements essentially equivalent to puffery or vague evaluations of the business; or forward-looking predictions, projections, and estimates. *See* Pls.' Am. Compl. ¶¶ 61, 65, 70, 73, 79, 80, 82, 90, 93, 99, 100, 101, 104. Projections of future performance not worded as guarantees are not actionable under the federal securities laws." *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1446 (5th Cir.1993). Moreover, predictive statements are not "facts" which are "false" when made merely because the prediction turned out to be wrong. Rather, a predictive statement is one that contains "at least three factual assertions that may be actionable": 1) The speaker genuinely believes the statement is accurate; 2) there is a reasonable basis for that belief; and 3) the speaker is unaware of any undisclosed facts that would tend seriously to undermine the accuracy of the statement." *Rubinstein v. Collins,* 20 F.3d 160, 166 (5th Cir.1994). Here, Plaintiffs allege *no facts* which demonstrate that (1) the projections or predictive statements were false when made; (2) Defendants did not believe the statements to be true when made; (3) the projections or predictive statements lacked any reasonable basis; or (4) Defendants knew of undisclosed facts that would seriously undermine the accuracy of the statements.

 Similarly, "[v]ague, loose optimistic allegations that amount to little more than corporate cheerleading are 'puffery' " and " . . . not actionable under federal securities law because no reasonable investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *Krim,* 989 F.2d at 1446. Plaintiffs allege no facts which demonstrate that any of the optimistic statements lacked any reasonable basis; or that Defendants knew of undisclosed facts that would seriously undermine the accuracy of the statements.

In addition, several of the statements about which Plaintiffs complain were not actually made by Capstead. Instead, Plaintiffs attempt to distort Capstead's actual public statements to create an inference of fraud. For example, Plaintiffs allege throughout their complaint that Capstead represented that it was "perfectly" hedged against interest-rate movement. *See* Pls.' Am. Compl. ¶¶ 21, 25, 26, 98(d). Such claim, however, is belied in Capstead's actual public statements regarding its investment strategy. In each quarterly filing with the SEC during the Class Period and its Annual Report on Form 10–K for 1997, Capstead stated that its "business plan [was] to build a mortgage banking operation with investments in mortgage securities and mortgage servicing with the goal of producing reasonably balanced operating results in a variety of interest rate environments." *See* Pls.' Am. Compl. ¶ 3; *see also* Defs.App. at 22, 38, 43, 54, 59, 64, 80, 85, 96, 102, 108,136, 152, 157, 169, 175, and 182. Pleadings which distort a company's actual public statements cannot support a claim for securities fraud.

**B. Allegations of Scienter**

Even if Plaintiffs' Amended Complaint may be construed as having sufficiently pleaded a misrepresentation or omission, to survive dismissal, Plaintiffs must also allege with specificity facts rise to a *strong inference* of scienter. *Abrams,* 292 F.3d at 430 (emphasis added). Plaintiffs have not done so.[11]

---

**11.** Plaintiffs' Amended Complaint purports to

allege several fraudulent statements by Defen-

### 1. Allegations Relating to Motive and Opportunity

■ As evidence of scienter, Plaintiffs allege that Defendants had motive and opportunity to commit fraud. Specifically, Plaintiffs allege that Capstead's status as a REIT prevented it from accumulating the capital necessary to meet its operating expenses and to sustain its acquisition activities. Plaintiffs therefore allege that Capstead was motivated to raise over $192.2 million from the sales of its own stock to the public through a dividend-reinvestment program and direct stock-purchase program made possible through a shelf offering which was expanded during the Class Period to raise much needed capital for its acquisition program and operating expenses. Plaintiffs further allege that the Individual Defendants were motivated to commit fraud to permit themselves to reap $10 million in salaries, bonuses and DER-conversion proceeds.

As previously stated, the Fifth Circuit has recently determined that allegations of motive and opportunity to commit fraud are alone insufficient to plead a strong inference of scienter. *Abrams*, 292 F.3d at 430; *Nathenson*, 267 F.3d at 412. While allegations of motive and opportunity may enhance other evidence of scienter, *id.*, the motives alleged in the complaint are not the types of motive that support a strong inference of scienter. Even before *Nathenson*, the Fifth Circuit made it clear that

a motive to raise capital, the desire for enhanced incentive compensation and the desire to sell stock at inflated prices, are all insufficient to support an inference of scienter. *See Melder*, 27 F.3d at 1102; *Tuchman*, 14 F.3d at 1068–69.

### 2. Allegations Relating to Conscious Behavior or Severe Recklessness

■ Plaintiffs assert that their complaint alleges evidence of knowing misconduct or severe recklessness; however, they fail to allege facts to support this assertion. Instead, Plaintiffs, throughout their complaint, state in a conclusory fashion that Defendants "knew," "should have known," "were reckless" in not knowing, and "falsely" stated particular facts. This type of conclusory recitation fails to provide the specific facts upon which an inference of conscious behavior may be based. *Melder*, 27 F.3d at 1102.

■ In an attempt to show knowing misconduct, Plaintiffs allege that the Individual Defendants had access to and control over internal corporate data and other non-public information that contradicted their positive, public representations about its mortgage servicing operation. Plaintiffs also attempt to particularize the documents [12] which provide the basis for their belief that Defendants were aware at the time they represented that the Company could continue to pay high dividends, that

---

dants or analysts under the heading "Summary of the Action." *See* Pls.' Am. Compl. ¶¶ 1–13. None of the statements, however, identifies the Defendant or analyst who made the statement, when and where the statements were made, or explain why the statements are misleading. Moreover, in some instances, the complaint fails to specify the content of the alleged false statement. Because the statements in these paragraphs do not satisfy the particularity requirements of the PSLRA and Rule 9(b), they are insufficient to give rise to a strong inference of scienter.

12. Specifically, Plaintiffs allege that Defendants routinely received the "Capstead Corporate Monthly Report" and other materials transmitted over the "Capnet" intranet, and monthly "Management Reports," which included operating plans, budgets and forecasts and reports of actual operations compared thereto. Plaintiffs also allege that the monthly corporate update included a specific "Financial Highlights" section, which monitored the trends and actual status of interest rates, and analyzed how the trends would affect Capstead's business. Pls.' Am. Compl. 22.

the combination of high rates of prepayments and falling interest rates were having a negative impact on the Company's earnings and dividends. With respect to the documentary evidence, Plaintiffs do not specifically identify any one particular internal document containing the alleged "adverse information"; the contents of such adverse or negative information; when the internal document containing the negative or adverse information was prepared; by whom it was prepared; or to whom was it directed. The complaint therefore provides no adequate basis for believing that Defendants statements concerning its projected earnings and dividends were false or misleading.

■ In any event, that Defendants were aware of an escalation in prepayments and decline in interest rates is not, in this case, sufficient to give rise to a strong inference of scienter. Plaintiffs must allege facts which demonstrate that at the time they made representations regarding Capstead's projected earnings and dividends, Defendants knew or were severely reckless in not knowing that prepayment levels were, at that time, adversely affecting Capstead's asset value or income. Although Plaintiffs allege that Defendants were aware by early 1997 that prepayments had risen to levels that were adversely affecting Capstead's mortgage securities and mortgage-service rights, Plaintiffs cite no documentary evidence or personal sources, to establish the basis for this belief. As such, the court finds such allegations insufficient to give rise to a strong inference of scienter.

Pleading scienter is not an insurmountable task if facts exist to support it. The approach is to state with particularity what each Defendant did and why the conduct rises to the level of scienter, rather than taking a shotgun approach in which Plaintiffs attempt to overwhelm the court with conclusory, speculative and esoteric allega-

tions. Stated in plain language, Plaintiffs simply need to connect the dots and state with particularity facts, rather than hyperbole or conclusory statements, which demonstrate what each Defendant did that would point to a strong inference of scienter. This would be the simplest and most efficient or effective way to show scienter, rather than attempting to show it by cross-linking a myriad of conclusory allegations. A complaint need not be long and detailed to accomplish this, but it must be specific. The court finds Plaintiffs' method of pleading more telling about what does not exist in the complaint, rather than what does exist. The court has considered all the factual allegations and circumstances, taken together, and concludes that they fail to give rise to a strong inference of scienter.

## C. Plaintiffs' Section 20(a) Claim

■ Plaintiffs also assert a claim against Lytle, Jacobs and Moore under section 20(a) of the Exchange Act. This section defines controlling person liability, providing that:

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter ... shall also be liable jointly and severally with and to the same extent as such controlled person ....

15 U.S.C. 78t(a). "To warrant a finding of liability under § 20(a) a plaintiff must show that the defendant controls a person upon whom liability could be imposed for a violation of the Securities Exchange Act." *Paul F. Newton & Co. v. Texas Commerce Bank,* 630 F.2d 1111, 1119 (5th Cir.1980). Plaintiffs allege that Lytle, Jacobs and Moore are controlling persons by reason of their positions with the Company, as previously set forth, including Lytle's membership on the Capstead's Executive and Nominating Committee, and Jacobs's and Moore's control over the Company's key

departments and its financial data, and their stock ownership. Pls.' Am. Compl. ¶ 119.

Arguably, a § 20(a) claim cannot be asserted against a defendant who is also charged with primary violation of § 10(b) and Rule 10b–5; that is, secondary liability under § 20(a) is an alternative, not a supplement, to primary liability under § 10(b) and Rule 10b–5. *See Lemmer,* 2001 WL 1112577, *12 (citing *Kalnit v. Eichler,* 85 F.Supp.2d 232, 246 (S.D.N.Y. 1999)). Because Plaintiffs assert a claim against Lytle, Jacobs and Moore under § 10(b) and Rule 10b–5, this would preclude a § 20(a) claim against them. The court need not decide the issue, however, as Plaintiffs' claims against these Defendants nevertheless fail. Where a primary violation by the "controlled person" (here, Capstead) has not been adequately pleaded, the court should also dismiss a section 20(a) claim. *See Coates I,* 26 F.Supp.2d at 923. Because Plaintiffs have failed to plead a violation of section 10(b) and Rule 10b–5, Plaintiffs' section 20(a) claim must also be dismissed. *See Coates II,* 55 F.Supp.2d at 645.

## IV. Plaintiffs' Request for Leave to Amend

Plaintiffs have requested the court allow them to amend their Complaint if it believes that they have not stated a claim upon which relief can be granted. Defendants did not specifically address Plaintiffs' request for amendment; however, they did request that Plaintiffs' Complaint be dismissed with prejudice. Implicit in that request is that Plaintiffs not be allowed to amend.

The decision to allow amendment of pleadings is within the sound discretion of the court. *Norman v. Apache Corp.,* 19 F.3d 1017, 1021 (5th Cir.1994). The appropriate starting point for amendment of pleading is Fed.R.Civ.P. 15(a). Under

Rule 15(a), other than in circumstances which do not apply here, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Although Rule 15(a)

> evinces a bias in favor of granting leave to amend, such leave is not automatic. In deciding whether to allow amendment, a district court may consider such factors as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment.

*Price v. Pinnacle Brands, Inc.,* 138 F.3d 602, 608 (5th Cir.1998) (internal quotations, footnotes, brackets and citations omitted); *see also Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Chitimacha Tribe of Louisiana v. Harry L. Laws Co., Inc.,* 690 F.2d 1157, 1163 (5th Cir.1982).

The court concludes that allowing Plaintiffs to replead is inappropriate because of futility and undue delay. First, there are multiple deficiencies with Plaintiffs' Amended Complaint. Claims against all Defendants are subject to dismissal for failure to satisfy the PSLRA particularity requirements (that is, plead with particularity facts supporting allegations based on information and belief or concerning Defendants' state of mind) and for failure to adequately plead scienter. Claims against all Defendants other than Lytle, Jacobs and Moore are further subject to dismissal because Plaintiffs failed to plead specific misrepresentations, or manipulative or deceptive acts, by those Defendants (specifically, Gilson and Rudluff). The extent of the deficiencies in the Complaint is a strong indication that amendment would be futile. *Moreover, although Plaintiffs request that they be allowed to amend*

*their Complaint, they have not identified how they propose to improve the Complaint so as to cure the defects identified herein, or submitted a proposed amended complaint to alert the court or Defendants of the substance of their proposed amendment. See McKinney v. Irving Indep. Sch. Dist.,* 309 F.3d 308, 315 (5th Cir.2002) (court did not abuse its discretion in denying leave to amend where plaintiffs filed a thirty-nine page response to the motion to dismiss urging that they properly pled facts to state a civil rights cause of action; failed to amend their complaint as a matter of right; failed to submit a proposed amended complaint; and failed to alert both the court and defendants to the substance of their proposed amendment). The court is not impressed by what it determines to be a routine and perfunctory request to amend which serves as a safety valve in the event the court rules in favor of Defendants. This "wait-and-see-what-happens" approach is untenable when, as discussed below, this court has previously articulated its interpretation of the applicable pleading standards, and has found allegations similar to those pleaded in Plaintiffs' Amended Complaint insufficient to withstand a motion to dismiss. Such tactics not only result in the parties expending considerable time and effort briefing the motion to dismiss, but the court is forced to expend scarce judicial resources drafting an opinion when no effort has been made to inform the court how the deficiencies could be cured.

Second, amendment of the pleadings at this stage will unnecessarily and unduly delay these proceedings. The first lawsuit in this consolidated action was filed on July 23, 1998, before the undersigned began his position as a judge. Plaintiffs Amended Complaint was filed on October 20, 2000, and the instant motions to dismiss were filed in February 2001. This case is nearly five years old. If the amended complaint is filed, it will be reviewed in detail, and Defendants without a doubt will file a second motion to dismiss. After the matter has been fully briefed by the parties, the court will undergo a painstaking review, as it already has done, to determine whether the amended complaint withstands scrutiny under the pleading requirements herein set forth. All of this will further delay resolution of this case, and such delay is simply not warranted given the numerous pleading deficiencies enumerated by the court and ability of Plaintiffs to seek formal leave to amend between the time the motions to dismiss were filed and the time the court ruled on them. The court simply cannot countenance the "wait-and-see-what-happens" approach. Such approach unnecessarily prolongs litigation and effectively awards Plaintiffs for the unjustified delay. Such undue delay does not warrant Plaintiffs being allowed to replead this case.

Moreover, the court finds it remarkable that Plaintiffs have not sought formal leave to amend their complaint. Since the filing of the instant motions to dismiss, the Fifth Circuit has issued three significant opinions addressing the pleading requirements for securities fraud post-PSLRA: *Nathenson, Tchuruk,* and *Baker Hughes.* In addition, this court issued four opinions addressing the level of specificity required when pleading securities fraud cases: two opinions before Defendants filed the instant motions to dismiss (*Branca and Calliott*), and two opinions after such time (*Lemmer* and *Schiller*). In each of those cases, Plaintiffs' counsel represented the purported class of plaintiffs. The court has repeatedly enunciated its interpretation of the PSLRA pleading requirements, and rejected the same type of pleading tactics as those upon which Plaintiffs relied in drafting their complaint. Further, in response to an inquiry by a claimant regarding when the court planned to rule, the court issued a letter and subsequent order stating its intent to rule on the

motions by a date certain, which put Plaintiffs on notice. At no time in the interim have Plaintiffs sought formal leave to amend their complaint, even though they could have sought leave to amend during the time the motions to dismiss were pending. Indeed, it is not uncommon for a plaintiff to seek leave to amend after a motion to dismiss has been filed. This court has allowed plaintiffs to amend in a number of cases after a motion to dismiss has been filed. Given that Plaintiffs' counsel have exceptional experience and competence in securities litigation (perhaps without peer in the nation) and are well aware of the relevant pleading requirements, Plaintiffs failure to seek leave to amend leads the court to determine that Plaintiffs' Amended Complaint in essence represents Plaintiffs' best case.[13] *See Jacquez v. Procunier,* 801 F.2d 789, 792–93 (5th Cir.1986) ("At some point a court must decide that a plaintiff has had fair opportunity to make his case; if, after that time, a cause of action has not been established, the court should finally dismiss the suit."); *Morrison v. City of Baton Rouge,* 761 F.2d 242, 246 (5th Cir.1985) ("We can assume, therefore, that the specific allegations of the amended complaint constitute the plaintiffs' best case . . . .").

In light of the time that has elapsed since the motions were ripe for disposition and the court's ruling, Plaintiffs' counsels' knowledge of the applicable pleading requirements, and Plaintiffs' failure to take any action to identify to the court any proposed changes that would cure the complaint's deficiencies, the court determines that Plaintiffs have already stated their best case and amendment would be futile, and that further amendment would unnecessarily and unduly delay this proceeding. The court therefore denies Plaintiffs' request to amend their Complaint.

## V. The Kon Lawsuit

The Kon lawsuit was transferred from the Southern District of Florida to this district on March 30, 2001. It was initially assigned to the Honorable Barbara M.G. Lynn and later transferred to this court on May 23, 2001, for possible consolidation into the instant consolidated case, which the court did on June 25, 2001. Although the court believes that Kon knew that Defendants motions to dismiss were pending, to remove any doubt and out of an abundance of caution, the court directs Kon to respond in writing by **April 21, 2003,** and inform the court why its ruling herein does not apply to the claims asserted by him. Such response shall not exceed **fifteen (15)** pages. *This response is limited strictly to Plaintiff Kon and no other Plaintiff. Anything beyond fifteen pages or anything that includes argument by any other Plaintiff will not be considered by the court.* Defendants are to reply only if the court so instructs them in writing.

## VI. Conclusion

For reasons stated herein, the court **grants** Defendant Capstead Mortgage Corporation's Motion to Dismiss, and **grants** the Individual Defendants' Motion to Dismiss.[14]

---

**13.** Indeed, Plaintiffs filed a sixty-page response to the motions to dismiss in which they urged that they properly pleaded facts to satisfy the pleadings standards under Rule 9(b) and the PSLRA. When a plaintiff fails to seek leave to amend after a motion to dismiss has been filed, and is aware of the stringent pleading requirements, the logical inference is that the plaintiff intends to stand on his or her complaint.

**14.** As it has determined that Plaintiffs have failed to allege facts that would entitle them

to relief, the court finds it unnecessary to address other arguments raised by the parties.